UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| DANYBELKIS VASQUEZ-RODRIGUE, ) | Criminal No. 21-cr-10010-FDS-2 |
| a/k/a "Dany," ) | |
| ) | |
| Defendant. ) | |

## GOVERNMENT'S MOTION IN LIMINE
## REGARDING ANTICIPATED DURESS DEFENSE

The United States of America, by and through the United States Attorney for the District of Massachusetts, Rachael S. Rollins, and Assistant United States Attorneys Alathea E. Porter and Stephen W. Hassink, hereby respectfully moves *in limine* to preclude the Defendant, Danybelkis Vasquez-Rodrigue (hereinafter, "VASQUEZ-RODRIGUE"), from introducing evidence at trial with respect to the defense of duress, including during defense counsel's opening and closing statements.

### FACTUAL BACKGROUND

The factual background is set forth in detail in the Government's Trial Brief, and therefore, is not fully repeated herein. In November 2020, a confidential source (hereinafter, the "CS") provided information to investigators about a Lawrence, Massachusetts based fentanyl supplier, subsequently identified as Saury Rodriguez-Ruiz (hereinafter, "RODRIGUEZ-RUIZ"). At the direction of investigators, on November 24, 2020, a cooperating witness (hereinafter, the "CW") successfully participated in a controlled purchase of nearly a kilogram of fentanyl from RODRIGUEZ-RUIZ. RODRIGUEZ-RUIZ provided the fentanyl to the CW on credit, and the agreement was that the CW would pay for the fentanyl within a month. Shortly after the

controlled purchase, RODRIGUEZ-RUIZ was arrested on unrelated state charges and he was detained pending trial in that matter. Following his arrest, an individual in Mexico identified only as "Riky" reached out to follow up about payment for the fronted kilogram of fentanyl sold to the CW. Initially, Riky told the CS to pay RODRIGUEZ-RUIZ's "girl" for the fronted fentanyl. The CS asked Riky if the CW could make payment to someone else. Riky then provided the phone number for an unidentified male known only as "Roladi." Agents provided Roladi's phone number to the CW to coordinate the money drop. The CW spoke with Roladi and discussed meeting the following day in Lawrence. Later that night, the CW received a call from Riky. During that call, Riky told the CW that he was the owner of the "vina," believed to be a reference to the fentanyl, and Riky told the CW that he had "a girl and a guy" who could pick up the payment for him. Riky told the CW he would send the CW the number for "the girl" and that the CW should coordinate with her to give her the money.

On December 16, 2020, the CW received a call from VASQUEZ-RODRIGUE. During the call, VASQUEZ-RODRIGUE told the CW that RODRIGUEZ-RUIZ was her husband and that the CW should meet her in Lawrence where the CW met with RODRIGUEZ-RUIZ for the kilogram of fentanyl ("You came down here once… Where my husband was"). Later that morning, they spoke again, and VASQUEZ-RODRIGUE again told the CW to meet her where the CW previously met with her husband ("I'll call you, so you can head towards the address where you got together that day with my husband").

When the CW was unable to connect with VASQUEZ-RODRIGUE, Riky directed the CW to meet with Roladi ("the guy") to make the payment. Agents met with the CW in advance of the meeting with Roladi. They searched the CW for personal money or contraband with negative results. Agents gave the CW a recording device and $10,000 in official agency funds. Agents

2

then set up surveillance and the CW went to the agreed upon location. Roladi got into the CW's vehicle and the CW provided Roladi with the $10,000 as partial payment for the kilogram of fentanyl.

Shortly after the meeting with Roladi, VASQUEZ-RODRIGUE called the CW. During the call, the CW told VASQUEZ-RODRIGUE that Riky sent him to give the money to someone else since VASQUEZ-RODRIGUE did not answer her phone when the CW called. VASQUEZ-RODRIGUE told the CW, "Let me call him then… Listen to what we are going to do. You delivered to him already. That was the first time and the last time you are going to deliver to that guy… This is my number… If anything happens, you call me at this number." She then asked the CW how much the CW paid the guy, and the CW said, "10." The CW told VASQUEZ-RODRIGUE that he knew he needed to come back with more money, and VASQUEZ-RODRIGUE then said, "I will communicate with, with whoever, whoever you delivered to now, for him to give me that money. Then, when you deliver something again, whatever it is, you give me a call on this phone." She went on to tell the CW, "You understand me, it's a business that you have to be very careful about, that you can't be involving so many people in this… My husband left me in charge of that because I more or less understand the business, I understand how everything moves, because I've been in that for a couple of years, you know what I mean?" VASQUEZ-RODRIGUE told the CW to call her if he needed anything and to save her number under the name "La Morena."

In December 2020, the CW spoke with both Riky and VASQUEZ-RODRIGUE regarding making the remaining payment for the kilogram of fentanyl. The CW and VASQUEZ-RODRIGUE agreed to meet on December 30, 2020 for the money drop-off. In advance of the meeting, agents searched the CW for personal money or contraband with negative results. Agents

provided the CW with audio/video recording devices and $32,000 in official agency funds. The CW called VASQUEZ-RODRIGUE and she said she would send the CW a text message with the address for them to meet. VASQUEZ-RODRIGUE then sent the CW the following text message, "271 Andover St. S Lawrence." Agents established surveillance in the area of that address and the CW drove to the location. Agents observed VASQUEZ-RODRIGUE arrive to that location. VASQUEZ-RODRIGUE instructed the CW to go in the residence at 4 Winthrop Avenue, Apt. 4D, a building immediately adjacent to 271 Andover Street. Once inside the apartment, the CW provided VASQUEZ-RODRIGUE with the $32,000 in official agency funds. During the meeting, VASQUEZ-RODRIGUE counted the money and discussed supplying the CW with more drugs. VASQUEZ-RODRIGUE asked the CW what he needed (meaning drugs) and said that she would "talk with him" and "tell him that you need something, to see if he can send it." She told the CW she would contact the CW when she was ready. The CW left the apartment and met with agents to debrief and provide the recording equipment.

Following the arrest of VASQUEZ-RODRIGUE, on January 14, 2021, pursuant to a federal search warrant, investigators searched 4 Winthrop Avenue, Apartment 4D, Lawrence, Massachusetts, the location of the December 30, 2020 money payment from the CW to VASQUEZ-RODRIGUE. Inside they found a ledger with phone numbers and amounts of money, documents bearing VASQUEZ-RODRIGUE's name, including documents form the Massachusetts Registry of Motor Vehicles, and a wooden box containing two small baggies of white powder, a bullet blender with powder residue, a bottle of lactose (commonly used to dilute drugs prior to sale), and a digital scale. The small baggies of powder were sent to the DEA Laboratory, tested positive for cocaine, and weighed over 6 grams. The blender, lactose, and digital scales are all items commonly used to prepare drugs for distribution. The ledger is

consistent with a record of drug-trafficking activity.

VASQUEZ-RODRIGUE provided investigators with consent to search two of her cell phones. After a forensic extraction of both phones, investigators found additional text messages and communications indicative of additional drug-trafficking activity. Additionally, investigators found photographs of receipts for multiple money transfers made between December 16, 2020 and January 12, 2020, indicating that VASQUEZ-RODRIGUE sent drug proceeds to multiple individuals at the direction of "Teka" (Riky), and that she used the same money remitter that she was observed going to immediately after the CW paid her the $32,000 on December 30, 2020. The photographs and messages indicate that VASQUEZ-RODRIGUE made multiple money transfers at the direction of an individual using the same WhatsApp account used by "Riky."[1]

## LEGAL STANDARD

"Duress is a common law defense that excuses criminal conduct if the defendant violated the law only because [the defendant] was unlawfully threatened by another person with death or serious bodily injury." *United States v. Vazquez*, 724 F.3d 15, 27 (1st Cir. 2013) (citing *United States v. Bailey*, 444 U.S. 394, 409-10 (1980)). "A duress defense requires proof that the defendant committed a crime as a result of: '(1) an immediate threat of serious bodily injury or death, (2) a well-grounded belief that the threat will be carried out, and (3) no reasonable opportunity to escape or otherwise to frustrate the threat.'" *United States v. Gonzalez-Perez*, 778 F.3d 3, 13 (1st Cir. 2015) (quoting *United States v. Arthurs*, 73 F.3d 444, 448 (1st Cir. 1996)). "The defendant has [the] burden of producing enough evidence to support a finding of duress." *United States v. Amparo*, 961 F.2d 288, 291 (1st Cir. 1992) (citing *Bailey*, 444 U.S. at 415-16). "The failure to show any one element of duress is sufficient to justify denying a request to submit a defense theory

---

[1] The contact was saved in VASQUEZ-RODRIGUE's phone as "Teka."

to the jury." *Arthurs*, 73 F.3d at 449 (citing *Bailey*, 444 U.S. at 416). However, if "a predicate warranting a duress instruction has been laid, the government is saddled with the additional burden of showing beyond a reasonable doubt that a defendant's criminal acts were not the product of duress." *Arthurs*, 73 F.3d at 448. "The government can overcome this obstacle if it proves that the defendant's evidence is bogus in some material respect, say, by showing that no threat occurred, or that the defendant's fear was unreasonable, or that the defendant had an opportunity to escape but did not exercise it." *Amparo*, 961 F.2d at 291.

"Further, a defendant cannot claim a duress defense if [the defendant] 'recklessly placed [herself] in a situation in which it was probable that [she] would be subjected to duress.'" *United States v. Diaz-Castro*, 752 F.3d 101, 109 (1st Cir. 2014) (quoting *United States v. Castro-Gomez*, 360 F.3d 216, 219 (1st Cir. 2004)).

When a duress defense is presented prior to trial, it is at the district court's "discretion to either employ a pre-trial hearing or wait until after all evidence has been heard at trial, to determine whether the evidence of duress is sufficient as a matter of law to warrant an instruction." *United States v. Bravo*, 489 F.3d 1, 10 (1st Cir. 2007). The First Circuit noted in *Bravo* that it is "unaware of any case mandating a pre-trial determination of the sufficiency of the evidence for a duress defense." *Id.* Nonetheless, when a pre-trial "'proffer in support of an affirmative defense is insufficient as a matter of law to create a triable issue, a district court may preclude the presentation of that defense entirely.'" *United States v. Lebreault-Feliz*, 807 F.3d 1, 4 (1st Cir. 2015) (quoting *United States v. Maxwell*, 254 F.3d 21, 27 (1st Cir. 2001)).

## ARGUMENT

Here, VASQUEZ-RODRIGUE cannot properly assert a duress defense. Given the evidence in this case, and clearly established First Circuit precedent, VASQUEZ-RODRIGUE's

6

claim of duress should fail because there are no facts present to support a defense that she experienced: "(1) an immediate threat of serious bodily injury or death," (2) that she held "a well-grounded belief that the threat [would] be carried out," and (3) that she had "no reasonable opportunity to escape or otherwise to frustrate the threat." *Arthurs*, 73 F.3d at 448.

### A. **There was no immediate threat of serious bodily injury or death.**

VASQUEZ-RODRIGUE has failed to demonstrate "an immediate threat of serious bodily injury or death." *Arthurs*, 73 F.3d at 448. To meet the first element of the three-prong test, the threat of harm must be "immediate, or even imminent." *Vazquez*, 724 F.3d at 28; *Gonzalez-Perez*, 778 F.3d at 14. "'[A] vague threat of future harm'…is insufficient to support a duress instruction." *Vazquez*, 724 F.3d at 28 (quoting *Arthurs*, 73 F.3d at 250). First Circuit "precedents make clear that…lengthy spaces of time between the threat and the crime make it very unlikely that the threat will be considered 'immediate.'" *United States v. Florentino-Rosario*, 19 F.4th 530, 537 (1st Cir. 2021) (finding threats not sufficiently immediate when defendant started receiving death threats in the Dominican Republic on September 9, but did not attempt to return to Puerto Rico until October); *see also United States v. Bello*, 194 F.3d 18, 26-27 (1st Cir. 1999) (finding failure of prong one and no immediate threat where eighteen hours passed between the alleged threat and defendant's actions).

There is nothing in the record to suggest that VASQUEZ-RODRIGUE was threatened at all, let alone that she was threatened with death or serious bodily harm. Nor is there any evidence that she was forced to participate in the initial December 16, 2020 money pick-up. The evidence establishes that VASQUEZ-RODRIGUE was in communication with Riky (or "Teka") via WhatsApp on December 9, and that she collected the first payment for the November 24 fentanyl sale on December 16. Through counsel, VASQUEZ-RODRIGUE provided a screenshot of a

portion of a December 23, 2020 WhatsApp chat with a contact named "Teka" that was allegedly taken from a different WhatsApp account that she claims to no longer have access to. There is no information as to the telephone number associated with "Teka" in this chat, nor is there any means to corroborate or authenticate the message. What is clear from the screenshot, however, is that it is but a portion of a longer conversation that is not depicted in the image. Though the screenshot includes a message purportedly from VASQUEZ-RODRIGUE to "Teka" saying that she does not want "any more problems," there is no context regarding what those "problems" are. Further, without the broader text exchange between VASQUEZ-RODRIGUE and "Teka," this alleged message, which was made a week following the first money pick-up, may too easily be misconstrued and taken out of context. Even if the message could be authenticated, and was complete, which it is not, the exchange itself is vague and does not include a direct and/or immediate threat of death or serious bodily injury against VASQUEZ-RODRIGUE. Without any evidence showing that VASQUEZ-RODRIGUE was so seriously threatened prior to making the initial choice to participate in the fentanyl transaction, *i.e.,* to collect the $10,000 as partial payment, she should be prohibited from arguing a defense of duress. *See Gonzalez-Perez*, 778 F.3d at 14 (declining duress instruction highlighting a lack of evidence that defendant was threatened prior to providing security to a dangerous person involved in drug trafficking).

There is *no evidence* that VASQUEZ-RODRIGUE was threatened with immediate harm prior to her joining the conspiracy when she voluntarily agreed to collect payment for the kilogram of fentanyl on December 16, 2020. Even if the purported December 23, 2020 message were authenticated and admitted as evidence, and/or if VASQUEZ-RODRIGUE were able to offer evidence of an immediate threat following the December 16 money collection, any threat that came *after* she knowingly and willingly joined the conspiracy would be insufficient as "'the duress

defense is unavailable if the defendant recklessly placed [herself] in a situation in which it was probable that [she] would be subjected to duress.'" *Castro-Gomez*, 360 F.3d at 219 (quoting 1 LaFave and Scott, *Substantive Criminal Law* § 5.3, at 622 (West 1996 and 2003 Supp.)); *see also Gonzalez-Perez*, 778 F.3d at 15 (noting defendant put himself in the situation numerous times in which he would likely be subject to duress by making himself available and at the service of the purported drug trafficker); *Diaz-Castro*, 752 F.3d at 108 (finding no evidence of immediate threat and highlighting fact that defendant went to two locations to participate in drug deals and voluntarily returned for the second transaction, thus finding defendant's argument "that he was so seriously threatened at the first as to have participated against his will" was "implausible."). By voluntarily participating in the first money pick-up on December 16, the duress defense is unavailable to VASQUEZ-RODRIGUE, even if she was later threatened, as she knowingly and willfully joined the conspiracy, voluntarily chose to participate in this illegal activity, and therefore, put herself in a situation with drug traffickers where she could be subject to future duress. As VASQUEZ-RODRIGUE cannot establish the first prong of the duress test, the Court should preclude her from presenting the defense at trial, including referring to duress in opening statements.

Based on conversations with counsel, the government anticipates that VASQUEZ-RODRIGUE may allege that she only participated in the collection of payment for the kilogram of fentanyl out of fear that Riky ("Teka"), a Dominican national who resides in Mexico, would harm her family living in the Dominican Republic if she refused. Any such argument fails on the merits. Fear of a possible threat falls short of the immediate and imminent threshold required of the duress test. *See e.g., Vazquez*, 724 F.3d at 27-28 (refusing to consider an alleged threat about what gang members do to people who "snitch" as an immediate threat or well-grounded fear even

though defendant claimed to have only participated in the drug trafficking scheme to protect herself and her children); *Gonzalez-Perez*, 778 F.3d at 13-14 (concluding an implied threat of taking care of defendant "in a violent way" if he went to the police and fear of harm to defendant's family were not immediate or imminent to justify a duress defense). While an implicit or generalized threat against VASQUEZ-RODRIGUE's family might constitute a "vague threat of future harm," it would fail to meet the rigorous threshold of immediate or imminent harm the defense requires. *Arthurs*, 73 F.3d at 450. Since VASQUEZ-RODRIGUE has failed to present any evidence to meet the threshold burden, her duress defense should be denied.

### B. **Even if there was an immediate threat, there is no basis to believe that the threat would be carried out.**

VASQUEZ-RODRIGUE has failed to demonstrate the particularities of the feared harm or any objective factors that would establish a "well-grounded belief" that the alleged threat of an immediate harm would be carried to fruition. *Arthurs*, 73 F.3d at 448. "In assessing whether a defendant has established sufficient grounds to mount a duress defense, courts do not examine the defendant's subjective perceptions about whether the threat was likely to be acted upon or whether escape was possible." *Castro-Gomez*, 360 F.3d at 219. Instead, "the inquiry hypothesizes a defendant of ordinary firmness and judgment and asks what such a defendant was likely to have experienced or how such a defendant was likely to have acted." *Id.* (rejecting defendant's request for duress instruction and upholding conclusion that "no person of ordinary firmness and judgment who wished to escape coercion" would return upon summons for an incomplete drug delivery). Further, the court's "objective analysis does not permit consideration of special factors unique to this particular defendant." *Vazquez*, 724 F.3d at 28 (rejecting defendant's claim that an implicit threat was more powerful due to defendant's prior traumatic experiences with firearms). VASQUEZ-RODRIGUE has failed to present any facts to substantiate a well-grounded and

10

objective fear that any alleged threat made by Riky ("Teka"), residing in Mexico, was immediate or would reasonably be carried out against herself, residing in Massachusetts, or her family in the Dominican Republic.  As no person of ordinary firmness and judgment would believe under these circumstances that a threat of immediate serious bodily injury or death would be carried out, VASQUEZ-RODRIGUE cannot satisfy the second prong of the duress defense.

### C. There was a reasonable opportunity for VASQUEZ-RODRIGUE to escape or otherwise frustrate the threat.

Even if the Court were to determine that there was an "immediate threat" of harm and a "well-grounded belief" that the threat would be carried out, the duress defense should be rejected nonetheless as VASQUEZ-RODRIGUE had "reasonable opportunity to escape or otherwise frustrate" the alleged threat.  *Arthurs*, 73 F.3d at 448.  The defense of duress is not available "if there was a reasonable, legal alternative to violating the law." *Bailey*, 444 U.S. at 410.

On December 16, 2020, VASQUEZ-RODRIGUE chose to contact Roladi to collect $10,000 for an outstanding payment for fentanyl purchased on November 24, 2020 on credit. Roladi was specifically contacted by Riky to collect this partial payment when the CW attempted, but was not able, to get in contact with VASQUEZ-RODRIGUE.  When the CW informed VASQUEZ-RODRIGUE that they paid Roladi, VASQUEZ-RODRIGUE told the CW that she would collect that money from Roladi and that the CW would only deal with her going forward. VASQUEZ-RODRIGUE also told the CW that her "husband," RODRIGUEZ-RUIZ, left her in charge of the "business" because she understands how it works and she had been in the "business" for "a couple of years."  Even if VASQUEZ-RODRIGUE could demonstrate that she was under an immediate threat and there was a well-grounded belief the threat would be carried out—which she cannot—VASQUEZ-RODRIGUE had an opportunity to frustrate the threat by allowing Roladi to take and retain payment and, thus, stay out of the conspiracy.  Instead, VASQUEZ-

11

RODRIGUE chose to assert her power and authority while her husband was in prison by inserting herself back into the transaction, collecting the partial payment from Roladi, informing the CW to only work with her moving forward, and by subsequently collecting the remaining payment of $32,000 for the kilogram of fentanyl.

Even if there were evidence that she was under duress when she first collected the December 16 payment from Roladi, VASQUEZ-RODRIGUE had multiple opportunities between December 16 and December 30, 2020 to escape any threat by going to the police and/or extricating herself from the transaction. *See Vazquez*, 724 F.3d at 18 ("But even granting the improbable notion that between December 5 and January 16, [defendant] did not have just a few minutes in private when she could have contacted the police, there is nothing to suggest that she could have simply terminated her romantic and professional relationship with [her boyfriend] in order to extricate herself from the drug-dealing business."); *see also Arthurs*, 73 F.3d at 449 (denying duress defense as defendant had reasonable opportunity to discard the drugs in the minutes following his encounter with the two strangers who threatened and demanded defendant smuggle cocaine). There is no evidence that VASQUEZ-RODRIGUE attempted to withdraw from the conspiracy or contact law enforcement officers at any time. *See Castro-Gomez*, 360 F.3d at 219 (holding "a reasonable person genuinely wishing to escape the predicament" would have foreseen the likelihood that the request to meet would have pertained to the uncompleted portion of the illegal activity and, instead of going to the location point, the defendant could "have summoned law enforcement officials to protect himself and his family."). As such, VASQUEZ-RODRIGUE cannot meet the requirements of the third prong of the duress defense.

## CONCLUSION

Because VASQUEZ-RODRIGUE cannot meet the legal threshold burden of production required for a duress defense, she should be precluded from referencing or alluding to the duress defense during opening, from introducing evidence at trial with respect to the defense of duress, or from arguing duress in closing. Permitting the defendant to raise the issue of duress would mislead and confuse the jury and should be prohibited.

                                Respectfully submitted,

                                RACHAEL S. ROLLINS
                                United States Attorney

             By:     /s/ *Alathea E. Porter*
                       ALATHEA E. PORTER
                       STEPHEN W. HASSINK
                       Assistant United States Attorneys

Dated: August 3, 2022

## CERTIFICATE OF SERVICE

I hereby certify that this document filed today through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                /s/ *Alathea E. Porter*
                                ALATHEA E. PORTER
                                Assistant United States Attorney